[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

No. 17-15566

---

D.C. Docket No. 5:16-cv-00051-LGW-RSB

AMY CORBITT, Individually and as Parent
and Natural Guardian of SDC, a Minor,

Plaintiff-Appellee,

versus

MICHAEL VICKERS,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Georgia

---

(July 10, 2019)

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

In this case involving an alleged use of excessive force, Defendant-Appellant Michael Vickers ("Vickers") asks this Court to reverse the district court's denial of his motion to dismiss on grounds that he is entitled to qualified immunity. In addition to hearing from the parties at oral argument, we have carefully reviewed the briefs, the record, and the relevant case law. Because Vickers's actions did not violate any clearly established rights, we conclude that he is entitled to qualified immunity and that the district court should have granted his motion to dismiss.

## I. BACKGROUND

### A. Factual Background.

This case is before us in the posture of an appeal from the district court's denial of Vickers's Fed. R. Civ. P. 12(b)(6) motion to dismiss. We set forth below the relevant allegations of the plaintiffs'[1] complaint. At all times relevant to this appeal, Vickers was a deputy sheriff in Coffee County, Georgia. On July 10, 2014, Vickers and other officers "participated in an operation to apprehend a criminal suspect, Christopher Barnett, whom [plaintiffs] ha[d] never met." The operation spilled over onto Plaintiff-Appellee Amy Corbitt's ("Corbitt") property after Barnett "wandered into the area."

[1] Four other plaintiffs collectively sought $2,000,000 in damages (plus punitive damages), but their claims have been withdrawn or resolved and are not at issue in this appeal.

At the time of the incident, one adult (Damion Stewart) and six minor children—including Corbitt's ten-year-old child SDC and two other children under the age of three—were outside in Corbitt's yard. Corbitt and two other minors were inside. At some point after Vickers and the other officers entered Corbitt's yard, the officers "demanded all persons in the area, including the children, to get down on the ground." An officer handcuffed Stewart and placed a gun at his back. The children were outnumbered by the officers, and plaintiffs alleged at least four of the children (including SDC) "remained seized by deadly firearms."

Then, "while the children were lying on the ground obeying [Vickers's] orders . . . without necessity or any immediate threat or cause, [Vickers] discharged his firearm at the family pet named 'Bruce' twice." The first shot missed, and Bruce (a dog) temporarily retreated under Corbitt's home. No other efforts were made to restrain or subdue the dog, and no one appeared threatened by him. Eight or ten seconds after Vickers fired the first shot, the dog reappeared and was "approaching his owners," when Vickers fired a second shot at the dog. This shot also missed the dog, but the bullet struck SDC in the back of his right knee. At the time of the shot, SDC was "readily viewable" and resting "approximately eighteen inches from . . . Vickers, lying on the ground, face down, pursuant to the orders of [Vickers]." Barnett (the fleeing suspect) "was visibly unarmed and readily compliant" with officers. According to the complaint, "[a]t no time did SDC, or

any other children . . . present any threat or danger to provoke . . . Vickers to fire two shots." Importantly, the parties do not dispute that Vickers intended to shoot the dog and not SDC.

Medical imaging confirmed a serious gunshot wound to SDC's right knee. Bullet fragments remained in the wound for an extended period of time after the shooting. SDC suffered severe pain and mental trauma. He received ongoing care from an orthopedic surgeon.

**B. Procedural Background.**

Corbitt, individually and as SDC's parent and guardian, brought a civil action against Vickers in his individual capacity pursuant to 42 U.S.C. § 1983. The complaint alleged deprivations of the right to be free from excessive force as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Corbitt asked the district court to award special and compensatory damages totaling $2,000,000, together with unspecified punitive damages.

In response, Vickers filed a motion to dismiss pursuant to Rule 12(b)(6). He asserted that he was entitled to qualified immunity because case law had not staked out a "bright line" indicating that the act of firing at the dog and unintentionally shooting SDC was unlawful. In support of this contention, Vickers pointed to the unpublished decision of this Court in Speight v. Griggs, 620 F. App'x 806 (11th Cir. 2015), which observed that "[i]n this circuit, there is no clearly established

right to be free from the accidental application of force during arrest, even if that force is deadly." Id. at 809.

The district court found that Vickers was not entitled to qualified immunity and denied his motion to dismiss. See generally Corbitt v. Wooten, No. 5:16-cv-51, 2017 WL 6028640 (S.D. Ga. Dec. 5, 2017). The district court highlighted several allegations from Corbitt's complaint, including that no officer was required to discharge a gun; that no one tried to restrain the dog; and that SDC was only eighteen inches from Vickers when Vickers fired at the dog. Id. at *1. The district court then found that SDC was seized even before Vickers fired a shot. Id. at *4.

Next, the district court reasoned that this case involves an "accidental shooting" and not an "accidental firing" because, even if Vickers did not intend to shoot SDC, he did intend to fire his gun at the dog. Id. at *4 & n.4. It then relied on "a reasonable inference from the allegations in the [c]omplaint, drawn in [Corbitt's] favor . . . that Vickers fired his weapon at the animal in order to keep control of SDC . . . [and] continue [his] seizure." Id. at *4. In other words, the district court thought "a jury could find that Vickers intended to shoot the animal in order to maintain his control of the situation and keep [SDC] from escaping." Id.

The district court then considered whether Vickers was entitled to qualified immunity. It noted this Court's general statement in Thornton v. City of Macon

that "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." Id. at *5 (citing Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998)). Relying on this statement, the district court then concluded that "Vickers is not entitled to qualified immunity if he used excessive force in firing his weapon." Id.

In determining whether Vickers used excessive force, the district court remarked that in some cases "no factually particularized, preexisting case law [is] necessary for it to be very obvious to every objectively reasonable officer facing [the defendant's] situation that [his] conduct . . . violated [the plaintiff's] right to be free of the excessive use of force." Id. at *6 (alterations in original) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002)). It then emphasized that "[t]he touchstone for reasonableness in animal shooting cases is typically officer safety," before concluding that Vickers may have acted unreasonably because the complaint alleged he fired his gun "without necessity or any immediate threat or cause" and that "no allegations suggest that Vickers was unsafe in any way or that Bruce [the dog] exhibited any signs of aggression." Id. (citations and alterations omitted). The district court acknowledged that the record could develop differently following discovery—at which time Vickers might raise the defense of qualified immunity again—but it ultimately concluded that "[a]t this stage, the complaint makes sufficient allegations to proceed." Id. at *7. Vickers appealed to

this Court, and we now consider whether the district court erred when it denied Vickers's motion to dismiss on grounds that he was not then entitled to qualified immunity.[2]

### C. Arguments on Appeal.

On appeal, Vickers argues the district court erred in denying his motion to dismiss. He contends there is only a single act at issue in this case: the firing of his gun with the intent to strike a dog. He notes the lack of any cases finding similar conduct to be unlawful, and emphasizes Supreme Court precedent providing that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." See Brower v. Cty. of Inyo, 489 U.S. 593, 597, 109 S. Ct. 1378, 1381 (1989).

Vickers also argues that this Court's published decision in Vaughan v. Cox[3] and our unpublished decisions in Speight[4] and Cooper v. Rutherford[5] compel the conclusion that there is no clearly established right to be free from the accidental

---

[2] To the extent it turns on a question of law, a denial of qualified immunity at the motion to dismiss stage is an immediately appealable interlocutory order. Behrens v. Pelletier, 516 U.S. 299, 308, 116 S. Ct. 834, 839–40 (1996). This is true even if the district court "reserved ruling on a defendant's claim to immunity" until a later stage of the litigation because the "immunity is a right not to be subjected to litigation beyond the point at which immunity is asserted." Howe v. City of Enterprise, 861 F.3d 1300, 1302 (11th Cir. 2017). Indeed, the "driving force behind creation of qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." Pearson v. Callahan, 555 U.S. 223, 232–33, 129 S. Ct. 808, 815 (2009) (alteration in original) (internal quotation marks omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2, 107 S. Ct. 3034, 3039 n.2 (1987)).

[3] 343 F.3d 1323 (11th Cir. 2003). See also discussion infra, Part II.C.

[4] 620 F. App'x 806.

[5] 503 F. App'x 672 (11th Cir. 2012).

application of force. He takes issue with the district court's attempt to "fit the facts of this case into the framework of Vaughan" because, to Vickers, there is no plausible way to conclude from the pleadings that his goal in shooting at the dog was to continue SDC's "lawful temporary detention incidental to the arrest of Barnett." He also argues the circuit split[6] on the question of whether the Fourth Amendment is ever violated by the accidental discharge of a weapon is by itself enough to show the law at issue here is not clearly established, before pointing to two district court decisions[7] from other jurisdictions that found no constitutional violation on facts somewhat similar to those presented here.

In response, Corbitt agrees with the district court that SDC was seized throughout the entire incident (even before Vickers fired his gun at the dog). She argues that Vickers's act of firing his gun at the dog violated SDC's Fourth Amendment rights. She then argues this Court should apply the objective reasonableness test from Graham v. Connor[8] and find that Vickers acted unreasonably. She contends it is clearly established that the use of excessive force

---

[6] Compare Dodd v. City of Norwich, 827 F.2d 1, 7 (2d Cir. 1987) (refusing to apply reasonableness standard to accidental shooting), with Pleasant v. Zamieski, 895 F.2d 272, 276–77 (6th Cir. 1990) (examining reasonableness even though shooting was accidental). In addition to the cases cited by Vickers, compare Schultz v. Braga, 455 F.3d 470, 479–483 (4th Cir. 2006) (focusing primarily on officer's lack on intent to shoot bystander in rejecting Fourth Amendment claim), with Roach v. City of Fredericktown, 882 F.2d 294, 296–97 (8th Cir. 1989) (rejecting Fourth Amendment excessive force claim brought by passengers of oncoming car injured as a result of high speed police chase but only after determining that officer's use of high speed chase was reasonable under the circumstances).

[7] Brandon v. Vill. of Maywood, 157 F. Supp. 2d 917, 924–25 (N.D. Ill. 2001); Dahm v. City of Miamisburg, No. C-3-95-207, 1997 WL 1764770, at *9 (S.D. Ohio 1997).

[8] 490 U.S. 386, 109 S. Ct. 1865 (1989).

in carrying out an arrest violates the Fourth Amendment, and that Vickers used excessive force because the complaint clearly indicates that it was not necessary to use any force at all.

## II. ANALYSIS

### A. Qualified Immunity in Motion to Dismiss Posture.

Although "the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." St. George v. Pinellas Cty., 285 F.3d 1334, 1337 (11th Cir. 2002). Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the "complaint fails to allege the violation of a clearly established constitutional right." Id.; see also Quiller v. Barclays Am./Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984), aff'd en banc 764 F.2d 1400 (11th Cir. 1985). This is a question of law that is reviewed "de novo, accepting the facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." St. George, 285 F.3d at 1337. When reviewing the denial of a qualified immunity defense asserted in a motion to dismiss, appellate review is "limited to the four corners of the complaint." Id. "Once an officer has raised the defense of qualified immunity, the burden of persuasion on that issue is on the plaintiff." Id.

**B. Qualified Immunity Law.**

The qualified immunity defense shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[9] Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The immunity balances two important public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). This allows officials to work without fear of liability, protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).

To overcome a qualified immunity defense, the plaintiff must make two showings. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199–1200 (11th Cir. 2007). First, she "must establish that the defendant violated a constitutional right." Id. Second, she must show the violated right was "clearly established." Id. Although the lower federal courts were once required to consider the first prong before the second, they are now "permitted to exercise their sound discretion in

[9] There is no question in this case that Vickers was acting in his discretionary capacity as a deputy sheriff when the challenged shooting occurred.

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S. Ct. at 818.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). This is because "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases," and an "official's awareness of the existence of an abstract right . . . does not equate to knowledge that his conduct infringes the right." Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (alteration in original) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640, 107 S. Ct. at 3039; see also Hope v. Pelzer, 536 U.S. 730, 736, 739, 122 S. Ct. 2508, 2513, 2515 (2002) (rejecting this Court's earlier requirement that "federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory" and not based on "abstractions" but instead only by "materially similar" cases as too rigid a gloss on qualified immunity law). Indeed, the "'salient question' . . . is whether the state of the law gave the

defendants 'fair warning' that their alleged conduct was unconstitutional." Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Hope, 536 U.S. at 741, 122 S. Ct. at 2516).

"Because identifying factually similar cases may be difficult in the excessive force context," Lee v. Ferraro, 284 F.3d 1188, 1198–99 (11th Cir. 2002), we may find fair warning in the law without also finding a factually identical case. In fact, this Court has since Hope identified three different ways a plaintiff can show that the state of the law gives officials fair warning of a clearly established right. First, she can still "show that a materially similar case has already been decided." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005). "This category consists of cases where judicial precedents are tied to particularized facts." Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012). In determining whether a right is clearly established under this prong, this Court looks to "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state." Griffin Indus., 496 F.3d at 1199 & n.6. Second, she can "also show that a broader, clearly established principle should control the novel facts" of a particular situation. Mercado, 407 F.3d at 1159 (citing Hope, 536 U.S. at 741, 122 S. Ct. at 2516). "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the

official's conduct did violate federal law when the official acted." Loftus, 690 F.3d at 1205 (alteration in original). Put another way, "in the light of pre-existing law the unlawfulness must be apparent." Id. Third, she could show that her case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." Mercado, 407 F.3d at 1159. Under this final test, the qualified immunity defense can be successfully overcome in an excessive force case "only if the standards set forth in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Lee, 284 F.3d at 1199 (alteration in original) (citation and internal quotation marks omitted). Notwithstanding the availability of these three independent showings, this Court has observed on several occasions that "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." See, e.g., Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir. 2009) (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)).

### C. The Constitutional Right Allegedly Infringed.

With these basic qualified immunity principles in mind, our § 1983 "analysis begins by identifying the specific constitutional right allegedly infringed." Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989). Two decisions provide relevant guidance in this regard. First, the Supreme Court in Graham held

that the Fourth Amendment governs "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person." Id. at 388, 109 S. Ct. at 1868–69. Second, "the Fourteenth Amendment guards against the use of excessive force against arrestees and pretrial detainees." J W ex rel. Tammy Williams v. Birmingham Bd. of Educ., 904 F.3d 1248, 1259 (11th Cir. 2018). Consequently, it is a threshold question whether SDC was "seized" at any point during his encounter with Vickers. If SDC was already seized when Vickers fired at the dog, or if the act of shooting SDC by itself constituted a seizure, then this case is properly analyzed under Fourth Amendment standards. If SDC was not already seized, and if the act of shooting SDC by itself does not constitute a seizure, then Fourteenth Amendment standards must be applied.

What makes this case more difficult than many excessive force cases is that SDC's role in the incident does not fit neatly into any of the usual analytical categories. SDC was not the intended target of an active arrest or investigatory stop (in which case the Fourth Amendment clearly would apply), nor was he an arrestee or pretrial detainee (in which case the Fourteenth Amendment clearly would apply). Rather, SDC was a ten-year-old child who happened to be playing in his own yard when it became an arrest scene by virtue of circumstances beyond his control. SDC is best described as an innocent bystander.

Reasonably construing the allegations in the complaint in Corbitt's favor, Vickers ordered SDC and the other children to the ground and held them there at gunpoint. An adult in the yard with SDC and the other children was placed in handcuffs. Other armed officers were present, and Vickers eventually discharged his weapon twice. The second shot accidentally hit SDC. We conclude that SDC was already "seized" when Vickers fired at the dog because "in view of all of the circumstances surrounding the incident, a reasonable person[10] would have believed that he was not free to leave." See United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980). And even though the complaint does not allege Vickers applied any physical force against SDC until Vickers's second shot struck his knee, there was without question an initial "show of authority" to which SDC clearly yielded when he lay face down on the ground pursuant to Vickers's orders. Cf. California v. Hodari D., 499 U.S. 621, 626–29, 111 S. Ct. 1547, 1550–52 (1991) (finding that fleeing suspect was not seized until he was tackled because he did not yield to initial pursuit by officers).

SDC's status as an innocent bystander is not inconsistent with our conclusion that he was seized by Vickers before any shots were fired. In making this observation, we are mindful "that the Fourth Amendment governs 'seizures' of

[10] Cf. Doe v. Heck, 327 F.3d 492, 510 (7th Cir. 2003) (finding seizure where "no reasonable child would have believed that he was free to leave"); Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005) (viewing case "through the eyes of a reasonable sixteen-year-old").

the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology," and that "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Michigan v. Summers, 452 U.S. 692, 696 n.5, 101 S. Ct. 2587, 2591 n.5 (1981) (quoting Terry v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968)).

This general principle applies with equal force in cases involving innocent bystanders located at the scene of an active arrest. In a case involving the execution of an anticipatory search warrant, this Court concluded that "officers were authorized to exercise 'unquestioned command of the situation' by placing all the occupants of the Premises on the ground for several minutes while securing the home and ensuring there was no danger to the officers or the public." Croom v. Balkwill, 645 F.3d 1240, 1253 (11th Cir. 2011) (quoting Muehler v. Mena, 544 U.S. 93, 99, 125 S. Ct. 1465, 1470 (2005)). This was true even with respect to an innocent bystander (the homeowner's mother Patsy Croom) who was not involved in any of the criminal activity in which her son was allegedly participating. After observing that Croom "was seized in the non-curtilage front yard," the Court also noted that the "officers' authority to detain Croom flowed not from the warrant, but rather from the Reasonableness Clause of the Fourth Amendment." Id. at 1248–49 (emphasis added). It then expressly found that there was no Fourth

Amendment violation because the officers had used only de minimis force in "pushing Croom to the ground from her squatting position and holding her there with a foot (or knee) in the back for up to ten minutes." Id. at 1252–53.

We note that at least two other circuits have recognized that even innocent bystanders who are temporarily detained have been subjected to a seizure for purposes of the Fourth Amendment. See Bletz v. Gribble, 641 F.3d 743, 755 (6th Cir. 2011) (noting that "even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others" and concluding that a reasonable jury could find that hour-long detention of innocent bystander following a deadly shooting violated the Fourth Amendment); United States v. Maddox, 388 F.3d 1356, 1362–63, 1367 (10th Cir. 2004) (applying Fourth Amendment reasonableness standard in concluding that officers may temporarily seize bystanders in area immediately adjoining arrest scene when seizure is justified by safety concerns and the scope of the seizure is reasonable under the circumstances); Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995) (balancing innocent bystander's Fourth Amendment rights against "governmental interest in securing the area around [the target of an arrest operation] and protecting officers from potential danger" in finding temporary detention was lawful). For purposes of this appeal, we find these cases persuasive

to the extent they demonstrate that an innocent bystander who is not suspected of any wrongdoing may be seized—in some cases reasonably and in other cases potentially unreasonably—within the meaning of the Fourth Amendment.

Given our conclusion that SDC was already seized when Vickers fired at the dog, we proceed by exercising our discretion to address only the qualified immunity issue as it relates to Corbitt's claim that Vickers's second shot at the dog violated SDC's clearly established Fourth Amendment rights.[11]

## D. Were Clearly Established Fourth Amendment Rights Violated?

The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The amendment "encompasses the right to be free from excessive force during the course of a criminal apprehension." Oliver, 586 F.3d at 905. To establish a Fourth Amendment claim for excessive force, a plaintiff "must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." Troupe v. Sarasota Cty., 419 F.3d 1160, 1166 (11th Cir. 2005).

As noted above, at the time Vickers fired at the dog, SDC just happened to be playing in his own yard when, for reasons beyond his control, his yard became

[11] Corbitt's complaint also set forth a Fourteenth Amendment claim for relief. She declined to withdraw that claim during the motion hearing before the district court, but the district court did not expressly reach the Fourteenth Amendment issue in its decision below. Although Corbitt briefed the Fourteenth Amendment issue before this Court (her arguments are not fully developed), there is no need for us to reach the issue given our conclusion that SDC was already seized—thus implicating the Fourth Amendment—when Vickers shot at the dog. See Graham, 490 U.S. at 388, 109 S. Ct. at 1868–69.

the scene of an arrest operation. Although we have held that SDC was already seized at the time of the shot, SDC is best described as an innocent bystander. And although the commands of the officers that SDC and the other children lie face down on the ground were actions directed at SDC and the other children, Corbitt does not claim that those actions violated SDC's Fourth Amendment rights; rather, she claims that the action of Vickers firing at the dog and accidentally hitting SDC violated the Fourth Amendment. We hold that Vickers's action of intentionally firing at the dog and unintentionally shooting SDC did not violate any clearly established Fourth Amendment rights.

First, we note that Corbitt failed to present us with any materially similar case from the United States Supreme Court, this Court, or the Supreme Court of Georgia that would have given Vickers fair warning that his particular conduct violated the Fourth Amendment. Corbitt admitted as much during the hearing on Vickers's motion to dismiss before the district court. Moreover, neither the district court's order nor our own research has revealed any such case. Thus, the only way Corbitt can successfully overcome Vickers's assertion of qualified immunity is to show either that "a broader, clearly established principle should control the novel facts" of this case as a matter of obvious clarity, or that Vickers's conduct "so obviously violates [the] constitution that prior case law is unnecessary." Mercado, 407 F.3d at 1159. As our cases suggest, it is very difficult to demonstrate either.

The district court found that Vickers was not entitled to qualified immunity at the motion to dismiss stage because (1) this Court had previously stated that "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment," Corbitt, 2017 WL 6028640 at *5 (quoting Thornton, 132 F.3d at 1400), and (2) Vickers acted unreasonably and used excessive force in firing his weapon because there was no reasonable threat of harm, id. at *6. This line of reasoning is an application of the second qualified immunity test that asks whether a broader, clearly established principle should, as a matter of obvious clarity, control the novel facts of a case. In so reasoning, we think the district court placed too much emphasis on this Court's statement in Thornton. For starters, we have expressly said otherwise in other qualified immunity cases. See, e.g., Mercado, 407 F.3d at 1159 ("[T]he principle that officers may not use excessive force to apprehend a suspect is too broad a concept to give officers notice of unacceptable conduct."); Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ("The line between lawful and unlawful conduct is often vague. [The] 'clearly established' standard demands that a bright line be crossed. The line is not found in abstractions—to act reasonably, to act with probable cause, and so on—but in studying how these abstractions have been applied in concrete circumstances."), as modified 14 F.3d 583 (11th Cir. 1994).

More important, perhaps, are two recent Supreme Court cases reminding courts that the qualified immunity analysis requires a clearly established right to be defined with specificity. In White v. Pauly, the Supreme Court—with palpable frustration—reiterated "the longstanding principle that clearly established law should not be defined at a high level of generality." ___ U.S. ___, ___, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." Id. (quoting Anderson, 483 U.S. at 640, 107 S. Ct. at 3039). The Supreme Court ultimately vacated a decision authored by a divided Tenth Circuit panel, faulting it for "fail[ing] to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment . . . [and for] rel[ying] on Graham, Garner, and their Court of Appeals progeny, which . . . lay out excessive-force principles at only a general level." Id. at ___, 137 S. Ct. at 550–52. Although the Supreme Court acknowledged that "general statements of the law are not inherently incapable of giving fair and clear warning[,]" it also emphasized that "Garner and Graham do not by themselves create clearly established law outside 'an obvious case.'" Id. (first quoting United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997); then quoting Brosseau v. Haugen, 543 U.S. 194, 199, 125 S. Ct. 596, 599 (2004)).

Just this year, the Supreme Court explained in another excessive force case:

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . .
>
> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

City of Escondido v. Emmons, ___ U.S. ___, ___, 139 S. Ct. 500, 2019 WL 113027, at *2–3 (2019) (per curiam) (alterations in original) (quoting Kisela v. Hughes, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018) (per curiam)).

In light of these basic principles, we conclude that the district court erred in relying on the general proposition that it is clearly established that the use of excessive force is unconstitutional. The unique facts of this case bear this out. Not only was SDC not the intended target of the arrest operation, he also was not the intended target of Vickers's gunshot. Both of these facts take this case outside "a run-of-the-mill Fourth Amendment violation." White, ___ U.S. at ___, 137 S. Ct. at 552. In other words, we are not dealing with "an obvious case," and no principles emerge from our decisions that speak with "obvious clarity" to the

unique and unfortunate circumstances that befell SDC. Indeed, we are unable to identify any settled Fourth Amendment principle making it obviously clear that volitional conduct which is not intended to harm an already-seized person gives rise to a Fourth Amendment violation.

Narrower principles do emerge from our excessive force cases. See, e.g., Vinyard, 311 F.3d at 1348 (finding use of pepper spray on mildly intoxicated and profane misdemeanant constituted "force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under Graham"); Oliver, 586 F.3d at 907–08 (denying qualified immunity where repeated use of Taser on non-threatening subject was "grossly disproportionate to any threat posed" and "any reasonable officer would have recognized that his actions were unlawful"). However, unlike the present facts these cases—along with those cited by our dissenting colleague in support of an almost identical proposition—all involve conduct that was intentional as to the injured plaintiff.

Unlike any prior cases that could clearly establish the law for this case, at the time Vickers fired at the dog, SDC was not the intended target of an arrest or investigatory stop. Nor was he the intended target of Vickers's shot; rather, he was accidentally hit when Vickers fired at the dog. The Supreme Court's decision in Brower indicates that a Fourth Amendment violation depends upon intentional action on the part of the officer. The Brower decision provides:

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act. . . . In sum, the Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct.
>
> Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant—even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally <u>desired</u> termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement <u>through means intentionally applied</u>. . . .
>
> . . . .
>
> . . . In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

489 U.S. at 596–99, 109 S. Ct. at 1381–82 (citations omitted).

Lower court decisions construing Brower have required, in order to state a violation of Fourth Amendment rights, that the officer's action must have been intended to stop the plaintiff, the party suing the officer. This reading of Brower finds strong support in the language quoted above. There is a clear indication that intentional government action directed toward the plaintiff, not accidental effects, is required. See id. at 596, 109 S. Ct. at 1381 ("[T]he Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct." (citation and internal quotation marks omitted)). Also, the Supreme Court's hypothetical of the police car rolling and pinning a person against a wall suggests that a Fourth Amendment violation occurs only when the governmental action intentionally targets the person thus pinned. And no Fourth Amendment violation occurs when the governmental action impacts an innocent passerby, or even when a serial murderer for whom there is an outstanding warrant is thus pinned, but only by lucky chance, as opposed to the murderer having been pinned by intentional action targeting him.

Lower courts have usually construed Brower to require such intentional action. For example, our own decision in Vaughan, 343 F.3d 1323, so construed Brower. There, this Court reversed the district court's grant of summary judgment in favor of an officer under the following circumstances. The officer, with another officer, was engaged in a high-speed chase of a red pickup truck suspected of

having been stolen. The pickup truck was driven by Rayson, and the man in the passenger seat, Vaughan, matched the description of the suspect. During a high-speed chase, the officer, Cox, fired three bullets into the pickup truck, none of which disabled either the truck or the driver. However, the third bullet punctured Vaughan's spine, seriously injuring him. This Court reversed the district court's grant of summary judgment to Officer Cox, but only after we concluded that "Vaughan was hit by a bullet that was meant to stop him," and therefore "he was subjected to a Fourth Amendment seizure." Id. at 1329. In so holding, we rejected as inapplicable cases from other circuits which had rejected Fourth Amendment claims brought by innocent bystanders or hostages accidentally harmed by police fire, noting that those "cases are of little aid to our inquiry . . . because Vaughan was neither an innocent bystander nor a hostage; instead, he was a suspect whom Deputy Cox sought to apprehend." Id. at 1328 n.4.

It is true that the Supreme Court's decision in Brower, and our Eleventh Circuit decision in Vaughan discussed above, focus on the seizure aspect of the claimed Fourth Amendment violation. And it is also true that we have held that SDC was already temporarily seized at the command of Vickers and the other officers who were controlling the scene in their attempt to capture the suspect, Barnett. Thus, Corbitt argues that Brower's requirement of intentional government conduct targeting SDC is satisfied, and thus she can prove a Fourth Amendment

violation pursuant solely to the objective reasonableness test without regard to any further intentionality element.

We conclude that Corbitt's argument cannot overcome Vickers's claim of qualified immunity. No case capable of clearly establishing the law for this case holds that a temporarily seized person—as was SDC in this case—suffers a violation of his Fourth Amendment rights when an officer shoots at a dog—or any other object—and accidentally hits the person. In other words, Corbitt is not claiming that the officers' command that SDC and the other children lie face down on the ground violated Fourth Amendment rights. Nor is she claiming that any other action of the officers directed toward SDC and the other children violated Fourth Amendment rights. Rather, she is claiming SDC's Fourth Amendment rights were violated by Vickers's shot—an action targeting the dog, not SDC. Corbitt's Fourth Amendment claim is based on a governmental action not directed toward SDC and which only accidentally harmed SDC.

Indeed, dicta in Brower itself (as noted above) suggests that accidental effects do not rise to the level of a misuse of power constituting a Fourth Amendment violation.[12] See Brower, 489 U.S. at 596, 109 S. Ct. at 1381. Cases from other circuits are generally in accord with this principle, especially when

[12] As indicated above, there is a circuit split as to whether government action which accidentally harms the plaintiff can rise to the level of a Fourth Amendment violation. See discussion supra note 6. This only further strengthens Vickers's claim that he is entitled to qualified immunity.

bystanders are involved. See Schultz v. Braga, 455 F.3d 470, 479–83 (4th Cir. 2006) (declining to extend Fourth Amendment protections to "reasonably foreseeable" victim of officer's gunshot where victim was already seized by traffic stop and officer did not intend to shoot her but instead intended to shoot her passenger); Childress v. City of Arapaho, 210 F.3d 1154, 1155–57 (10th Cir. 2000) (holding no Fourth Amendment seizure occurred when two escapees abducted plaintiff and her two-year-old daughter and stole their minivan, and law enforcement officers shot intending to restrain the minivan and escapees but accidentally injured plaintiff and her daughter who were hostages in the minivan); Medeiros v. O'Connell, 150 F.3d 164, 167–69 (2d Cir. 1998) (in similar factual situation, holding no Fourth Amendment seizure and relying upon Brower, 489 U.S. at 596, 109 S. Ct. at 1381, for the proposition that the Fourth Amendment addresses misuse of power, not accidental effects of otherwise lawful conduct); Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795 (1st Cir. 1990) (in a similar factual situation, holding: "[a] police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern," and relying upon Brower for the proposition that the Fourth Amendment addresses misuse of power, not accidental effects of

otherwise lawful conduct);[13] cf. Dodd v. City of Norwich, 827 F.2d 1, 7 (2d Cir. 1987) (rejecting a Fourth Amendment claim of a § 1983 plaintiff where suspected burglar was deemed to have been already seized and holding: "It makes little sense to apply a standard of reasonableness to an accident.").[14]

The foregoing authorities do not support Corbitt's argument that once SDC was already seized in an unchallenged manner, the intent requirement of Brower is satisfied, and a Fourth Amendment violation is established if the officer's actions were objectively unreasonable. As the Second Circuit noted in Dodd, that would mean that a Fourth Amendment violation could be based upon simple negligence. Dodd, 827 F.2d at 7–8. Moreover, the cases noted above have not distinguished between the following two factual situations. In the first situation, an officer fires at the robber or escapee and the vehicle in which he is fleeing with the plaintiff-hostage, but the bullet accidentally also hits the unseized plaintiff-hostage, thus raising the issue of whether the bullet striking the plaintiff-hostage constitutes a

[13] See also discussion infra note 17 (comparing First Circuit case finding Fourth Amendment violation where accidental effects of conduct intentionally directed toward plaintiff resulted in shooting death of plaintiff).

[14] While it is true that "only binding precedent can clearly establish a right for qualified immunity purposes," Gilmore v. Hodges, 738 F.3d 266, 279 (11th Cir. 2013), non-binding persuasive authority can be used to indicate that a particular constitutional right is not clearly established, see Denno v. School Bd. of Volusia Cty., 218 F.3d 1267, 1272–75 (11th Cir. 2000) (concluding that school officials were entitled to qualified immunity because, in part, they could justifiably rely on "the perspective of several reasonable jurists" from outside Eleventh Circuit in navigating the "relevant legal landscape"). Thus, we need not, and expressly do not, express an opinion with respect to the correctness of cases like Schultz, Childress, Medeiros, Landol-Rivera, or Dodd. We cite such cases solely as examples of opinions of reasonable jurists which indicate that the relevant law is not clearly established.

Fourth Amendment seizure. This factual situation is presented in the Brower dicta, and in cases like Childress, Medeiros, and Landol-Rivera, all indicating there is no Fourth Amendment seizure in that situation. In the second factual situation, the plaintiff-bystander is already seized in an unchallenged manner, but then is harmed accidentally by a shot fired at someone or something other than the plaintiff-bystander. For example, in Schultz, the officer fired the shot at the person he believed to be a robbery suspect in the passenger seat, but "blood and glass set in motion by the gunshot" hit the already-seized Harkum in the driver's seat. Schultz, 455 F.3d at 483. The court held that the officer was properly granted qualified immunity from Harkum's Fourth Amendment claim "because the force employed was not directed towards her," and because the focus of the Fourth Amendment "did not involve unintended consequences of government action." Id. (second quotation quoting from Brower, 489 U.S. at 596, 109 S. Ct. at 1381). And in the instant case, the already-seized bystander, SDC, was harmed accidentally when Vickers intentionally fired at the dog. See Dodd, 827 F.2d at 7–8 (holding no Fourth Amendment violation in a factual situation involving an accidental shooting during handcuffing after the suspect was deemed to have been already seized).

Not only have the cases not distinguished between these two factual situations, it is not obvious that there should be a different result in the two situations, in light of the fact that the focus of the Fourth Amendment analysis is

on the "misuse of power," not the "accidental effects of otherwise lawful government conduct." Brower, 489 U.S. at 596, 109 S. Ct. at 1381. In other words, it is the "accidental effect" that is significant. Stated in the language of the relevant standard, the law is not clearly established that there is a Fourth Amendment violation when an already-seized bystander, as in the instant case, is accidentally harmed as an unintended consequence of an officer's intentional shot at something else entirely.

In sum, not only is there no materially similar binding case that clearly establishes a Fourth Amendment violation; dicta from the Supreme Court and nonbinding case law indicates that reasonable jurists have found no Fourth Amendment violation in similar circumstances.[15] We conclude that the accidental shooting, as occurred here, does not constitute a clearly established Fourth Amendment violation as a matter of obvious clarity.[16] Thus, Corbitt has failed to demonstrate a clearly established Fourth Amendment violation, either by the first method (a materially similar, binding case), or the second method (the violation is

[15] See also discussion supra note 14.

[16] The district court assumed the Brower intent requirement could be satisfied by the inference the district court derived from plaintiffs' allegations "that Vickers fired his weapon at the animal in order to keep control of SDC . . . [and] continue [his] seizure." Corbitt, 2017 WL 6028640, at *4. Thus, under the district court's construction, Vickers's shot was an attempt to continue his seizure of SDC, and thus satisfied the required intent element. However, the shot fired by Vickers—the act on which Corbitt bases her allegation of excessive force in violation of the Fourth Amendment—was clearly targeting Bruce, the dog; it is absolutely clear that it was by pure accident that the shot struck SDC. In any event, as demonstrated in the text, the district court's position is not supported by clearly established law such that it would be apparent to any reasonable officer in Vickers's shoes that his actions violated the Fourth Amendment.

a matter of obvious clarity from such a binding case). We turn therefore to the third method (the challenged conduct so obviously violates the Fourth Amendment that prior case law is unnecessary).

This is not a case that so obviously violates the Fourth Amendment that prior case law is unnecessary to hold Vickers individually liable for his conduct. To find otherwise would require us to conclude that no reasonable officer would have fired his gun at the dog under the circumstances. This we are unable to do. With the benefit of hindsight, we do not doubt Vickers could have acted more carefully; the firing of a deadly weapon at a dog located close enough to a prone child that the child is struck by a trained officer's errant shot hardly qualifies as conduct we wish to see repeated. However, even the underlying constitutional issue itself (which of course is easier for a plaintiff to prove than proving that particular circumstances violate clearly established constitutional law) is evaluated pursuant to a "calculus . . . [that] must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396–97, 109 S. Ct. at 1872. In the instant qualified immunity context, we are cognizant that several cases (some of which are mentioned above) have considered similar accidental shootings of bystanders, and that many, if not most, of the jurists involved have concluded that there was no clearly established Fourth Amendment violation. Indeed, we are

aware of no case and no jurist indicating that such an accidental shooting (i.e., one resulting from volitional conduct indisputably intended to stop someone or something other than the plaintiff) so obviously violates the Fourth Amendment that prior case law is unnecessary to hold that the officer violated clearly established law.[17] Moreover, the facts alleged here involve "accidental effects" of conduct directed toward something other than the plaintiff, not the kind of "misuse of power" which Brower suggests is the focus of a Fourth Amendment violation. Brower, 489 U.S. at 596, 109 S. Ct. at 1381. We conclude that the circumstances alleged in this case do not so obviously violate the Fourth Amendment such that it would be apparent to every reasonable officer that his actions were in violation of the Fourth Amendment. See Lee, 284 F.3d at 1199 (recognizing that a plaintiff can surmount a qualified immunity defense by showing "that the official's conduct lies

[17] Cf. Stamps v. Town of Framingham, 813 F.3d 27 (1st Cir. 2016). In Stamps, the First Circuit denied qualified immunity to an officer accused of using excessive force during the execution of a search warrant where the officer pointed a "loaded assault rifle at the head of a prone, non-resistant, innocent person who present[ed] no danger, with the safety off and a finger on the trigger," then accidentally shot the person to death. Id. at 29, 39–40.

Although relevant to our discussion here, the legal principle deemed clearly established in Stamps is materially different from the principle at issue in this case because Stamps involved the accidental consequences of conduct otherwise intentionally directed toward the plaintiff. In Stamps, the officer intentionally aimed his assault rifle at the plaintiff and then accidentally shot the plaintiff. Here, Vickers intentionally fired his gun at the dog and then accidentally shot SDC. Recognizing a similar distinction, the First Circuit in Stamps noted that its decision there was not inconsistent with its earlier decision in Landol-Rivera, 906 F.2d 791. In particular, it observed that the Landol-Rivera court had relied on Brower's intent requirement in finding no Fourth Amendment violation on grounds that "it was not the officer's intent to seize the hostage." Stamps, 813 F.3d at 37 n.10. Put another way, Landol-Rivera's "holding simply has no relevance [to Stamps] since there is no question that Stamps was the intended target of [the officer's] seizure." Id. We agree and find that this case is more like Landol-Rivera than Stamps because Vickers intended to shoot the dog, not SDC.

so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law" and emphasizing that "[u]nder this test, the law is clearly established, and qualified immunity can be overcome, only if the standards in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful" (second alteration in original) (citations and internal quotation marks omitted)).

We cannot agree with our dissenting colleague either on the facts or the law. For example, in the absence of allegations of actual facts demonstrating that every objectively reasonable officer in Vickers's shoes would necessarily perceive a total lack of reason to subdue a dog roaming freely at the scene of an active arrest, we decline to accept the plaintiffs' conclusory allegations that there was no need to subdue the dog. See Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."). We think it even more appropriate to disregard such allegations in the context of the qualified immunity and excessive force issues raised by this case, where the Supreme Court has directed us to judge the "reasonableness at the moment" of the officer's actions not from the plaintiff's perspective, but instead "from the perspective of a

reasonable officer on the scene," who was operating without the "20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

In any event, the allegations of the complaint are lacking in allegations of actual facts[18] that paint a scenario that so clearly and obviously presented such danger to SDC that every objectively reasonable officer confronted with the situation Vickers encountered would have known, in light of "the standards set forth in Graham and our own case law," Lee, 284 F.3d at 1199, and in the ten seconds allegedly available, that a shot at the dog would violate the Fourth Amendment. Thus, we cannot conclude that the instant allegations rise to that rare level of conduct that "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." Id.; see also Mercado, 407 F.3d

[18] Contrary to the dissent's suggestion, we do not discount the complaint's conclusory allegation that the dog presented no threat because we accept instead Vickers's conclusory allegation that he did feel the need to subdue the dog. Rather, we discount the complaint's allegation because it is conclusory. There are no allegations of actual fact indicating that the dog was non-threatening. In contrast to Corbitt's conclusory allegations of no threat and no justification, we suggest hypothetical illustrations of allegations of actual fact which Corbitt might have alleged depending upon what the actual facts were. For example, Corbitt might have alleged that the dog was a small and non-aggressive breed, like a toy poodle, or, if it was a breed known for aggression, that the dog was walking slowly towards its owners and not barking at all.

We also cannot agree with our dissenting colleague that the actual facts alleged warrant the inference that the dog "was surrounded by children." The complaint does not contain allegations of actual fact to support the dissent's assertion that the dog was surrounded by children when Vickers fired at it. To the extent that the allegations focus on the relative locations of the dog to other children, they allege only that Vickers "discharged his firearm in the immediate vicinity of several innocent minor children and bystanders," and "a large number of innocent bystanders, mostly children in the immediate area." The dissent's inference that Vickers shot "into a group of children" overstates the factual allegations contained in Corbitt's complaint.

at 1159 (noting that, under the third method, the conduct at issue must rise to a level that "so obviously violates [the] constitution that prior case law is unnecessary"). As a result, we also cannot conclude that Corbitt has overcome the high legal threshold placed on plaintiffs who seek to overcome an officer's qualified immunity defense on the basis of the third method on which the dissent focused. That this complaint fails to surmount that high legal threshold is especially apparent in light of the considerable case law indicating that a Fourth Amendment violation must involve official action that intentionally targets the plaintiff. Not only does that case law strongly indicate it is not clearly established that the accidental effects of official actions targeting others gives rise to a Fourth Amendment violation, it even suggests that such actions may not even constitute a Fourth Amendment violation in the first place. The relevant question is not whether a reasonable officer would have refrained from shooting the dog. Instead, the relevant question is whether every reasonable officer would have inevitably refused to do so in light of the Fourth Amendment standards established by Graham and our own case law. Our answer to that relevant question is in the negative.

Accordingly, Vickers's qualified immunity defense must prevail in the absence of a materially similar case or a governing legal principle or binding case that applies with obvious clarity to the facts of this case.

## III. CONCLUSION

In conclusion, we hold that Vickers is entitled to qualified immunity because, at the time of the incident giving rise to this appeal, there was no clearly established law making it apparent to any reasonable officer in Vickers's shoes that his actions in firing at the dog and accidentally shooting SDC would violate the Fourth Amendment. Because we find no violation of a clearly established right, we need not reach the other qualified immunity question of whether a constitutional violation occurred in the first place. This opinion expressly takes no position as to that question. The order of the district court denying Vickers's motion to dismiss is hereby reversed, and the case is remanded to the district court with instructions to dismiss the action against Vickers.

**REVERSED** and **REMANDED**.

WILSON, Circuit Judge, dissenting:

The majority accurately points out that qualified immunity protects "all but the plainly incompetent." Maj. Op. at 10 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Because no competent officer would fire his weapon in the direction of a nonthreatening pet while that pet was surrounded by children, qualified immunity should not protect Officer Vickers. Therefore, I dissent.

I.

On July 10, 2014, several officers, including Deputy Sheriff Michael Vickers, initiated a search to locate and apprehend a criminal suspect, Christopher Barnett.[1] The search led them to Amy Corbitt's property after Barnett, "whom [plaintiffs] ha[d] never met," "wandered into the area." Barnett, Damion Steward, and six children—including Corbitt's ten-year-old child S.D.C., and two children under the age of three—were on the property's front yard. The officers detained Barnett and ordered everyone to get on the ground. An unidentified officer handcuffed Steward and held a gun against his back. The detained children "were

[1] The summary of the facts is based on the allegations made in the Complaint. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) (noting that, at the motion to dismiss stage, "[w]e are required to accept all allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor").

[also] held at gun point, each having an officer forcefully shove the barrel of a loaded gun into their backs."

While Barnett, Damion, and the children were detained on the lawn, Vickers spotted the Corbitt family pet, a dog named Bruce. Although no one "appear[ed] to be threatened by [Bruce's] presence," Vickers attempted to shoot the dog. He missed, and Bruce retreated under the Corbitt's residence. Roughly ten seconds later, Bruce reemerged and was "approaching his owners" on the yard. Vickers fired another shot, again missing the pet. The errant bullet struck S.D.C. behind the knee as the child lay in a "face down position on the ground at the request of defendants." Importantly, S.D.C. was "readily viewable" *a mere eighteen inches from Vickers* at the time the shot was fired, and "[o]ther minor children were [ ] within only a few feet of [ ] Vickers." As a result of the bullet wound, S.D.C. suffered severe physical pain and mental trauma.

II.

To overcome a qualified immunity defense, the plaintiff must (1) "establish that the defendant violated a constitutional right" and (2) demonstrate that the violated right was "clearly established." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199–1200 (11th Cir. 2007). I agree with the majority's determination that Corbitt satisfied the first requirement. *See* Maj. Op. at 14–18. I disagree, however,

with the majority's conclusion that Corbitt failed to demonstrate that Vickers violated a "clearly established" constitutional right.

We have identified three ways a plaintiff can show that a right was clearly established at the time of the defendant's action. First, she can "show that a materially similar case has already been decided." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Second, she can "show that a broader, clearly established principle should control the novel facts" of a particular situation. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Third, she can show that her case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Id.*; *see also Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (noting that, to show that a right is "clearly established," plaintiffs may show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." (citation omitted)). I believe the instant case falls within the third category.

Under this third recognized category, a plaintiff in an excessive force case can overcome an officer's qualified immunity defense "only if the standards set forth in *Graham* and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Lee*, 284 F.3d at

1199 (alteration in original) (citation and internal quotation marks omitted). In *Graham v. Connor*, the Supreme Court held that the reasonableness analysis "requires careful attention to the facts and circumstances of each particular case," including the severity of the crime at issue, the safety interests of officers and others, and any risk of violence or flight by a suspect. 490 U.S. 286, 396 (1989) (citation omitted).

Consider the present facts and circumstances: officers arrived at a home and found the subject of their search. At gunpoint, the officers ordered the suspect and all persons in the area—including six children—to the ground. Everyone complied. A nonthreatening family pet was present on the scene; there is nothing to suggest that this pet acted with hostility or threatened the safety of anyone—including the officers. With all the children and the suspect still lying on the ground pursuant to the officers' commands, Officer Vickers shot at the family pet. He missed. He waited. He shot again. He missed again, instead striking a child who had been—at all times—lying within arm's reach of the officer.

This conduct—discharging a lethal weapon at a nonthreatening pet that was surrounded by children[2]—is plainly unreasonable. The nonthreatening nature of

---

[2] The majority maintains that the Complaint does not "contain allegations of actual fact to support the dissent's assertion that the dog was surrounded by children when Vickers fired at it." Maj. Op. at 37 n.18. But there are allegations in the Complaint that, considered together, lead to the reasonable inference that the dog was surrounded by children at the time Officer Vickers fired the shot. *See Sebastian*, 918 F.3d at 1307 (noting that, at the motion to dismiss stage, we must draw all reasonable inferences in favor of the nonmoving party). Specifically, the

the pet is crucial to this conclusion.[3] We have consistently denied qualified immunity when the defendant-officer exhibited excessive force in the face of no apparent threat. *See cf. Saunders v. Duke*, 706 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."); *see, e.g.*, *Slicker v. Jackson*, 215 F.3d 1225, 1227 (11th Cir. 2000) (denying qualified immunity to officer who arrested plaintiff, placed him in handcuffs and then, after he had been fully secured, slammed his head into the pavement);

---

Complaint alleges that the dog was "approaching his owners," including S.D.C., on the yard when Officer Vickers fired. It also alleges that S.D.C. "was approximately eighteen inches from Defendant Vickers" and "[o]ther minor children were [ ] within only a few feet of Defendant Vickers" when Officer Vickers fired. Finally, the Complaint alleges that Officer Vickers fired a shot at the dog but instead hit S.D.C. Based on these three allegations—(1) that the dog was approaching S.D.C., (2) that Officer Vickers was a few feet from S.D.C. and the other children, and (3) that Officer Vickers fired a shot at the dog, but instead struck a child—we can, and should, reasonably infer that the dog and the children were closely situated.

[3] The majority declined to accept Corbitt's allegations that the dog was nonthreatening, reasoning that the allegations were "conclusory." Maj. Op. at 37. I disagree with such a characterization. At this stage, we must take plaintiff's allegations as true. *Sebastian*, 918 F.3d at 1307; *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true."). We are therefore obligated to accept that the dog "posed no threat," that "[no]one appear[ed] to be threatened by its presence," and that it was merely "approaching his owners" at the time Officer Vickers fired. Instead, the majority appears to credit Officer Vickers' own conclusory account—that he shot the dog "because it was approaching him, the officers, and the detained bystanders in a manner that led him to conclude that he needed to subdue it." *See* Maj. Op. at 37 (concluding that some officers may find it reasonable to subdue a dog "roaming freely at the scene of an active arrest"). Neither Officer Vickers nor the majority elaborates on the dog's behavior or explains how its behavior was so outrageous as to warrant shooting into a group of children. And even if such an explanation existed, *we are required to accept Corbitt's allegations as true*. It is not for us to weigh the likelihood of either account. That is a job for the jury.

*Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926–27 (11th Cir. 2000) (denying qualified immunity to officer who allowed police dog to attack arrestee who was already subdued and lying on the ground); *Smith v. Mattox*, 127 F.3d 1416, 418–20 (11th Cir. 1997) (denying qualified immunity to officer who broke plaintiff's arm after plaintiff "docilely submitted" to officer's request to "get down"). It is also relevant that Officer Vickers was a mere foot and a half from S.D.C. and was only a few feet from several other children. Nonetheless, facing no apparent threat, Officer Vickers chose to fire his lethal weapon in the direction of these children.[4] No reasonable officer would engage in such recklessness and no reasonable officer would think such recklessness was lawful. Therefore, I agree with the district court that Officer Vickers should not be entitled to qualified immunity. *Lee*, 284 F.3d at 1199.

I respectfully dissent.

[4] Officer Vickers emphasizes that he intended to shoot the dog and only accidentally struck S.D.C. He argues that such an inadvertent injury cannot be deemed a result of "excessive force." I do not dispute that the shooting of S.D.C. was accidental. I maintain that Officer Vickers' intentional action—shooting at a dog that was surrounded by children—was unreasonable.